United States District Court
Southern District of Texas
**ENTERED**
August 02, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Evanston Insurance Company, Individually and as Successor by Merger to Essex Insurance Company, | § § § § § | |
| *Plaintiff,* | § § | Case No. 4:20-cv-00103 |
| v. | § § | |
| Texas Concrete and Sand Gravel, Inc. and Apcon, Inc., | § § § | |
| *Defendants.* | § § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Plaintiff Evanston Insurance Company, individually and as successor to Plaintiff Essex Insurance Company (together, "Evanston") filed an Amended Motion for Summary Judgment. Dkt. 51. After carefully considering the motion, response, Dkt. 62, reply, Dkt. 65, the parties' presentations at the June 28, 2022 motion hearing, and the supplemental post-hearing briefs, Dkts. 67-68, the Court recommends that Evanston's Motion be denied.

## <u>Background</u>

This is an insurance coverage dispute. Evanston sued Texas Concrete Sand and Gravel, Inc. ("Texas Concrete") and Apcon Services, LLC ("Apcon") (collectively, the "Insureds") for a declaration that it did not owe a duty to

defend or indemnify them in three underlying lawsuits. Evanston issued Commercial General Liability (CGL) policies to both insureds. Dkt. 51, Exs. 1-7. According to their policies, Texas Concrete was in the business of "excavating sand/gravel," and Apcon was in the "commercial construction" business. *Id.*, Ex. 1 at 8; Ex. 6 at 29. The policies covered the period of 2017 when Hurricane Harvey made landfall in Houston, causing catastrophic flooding. *Id.*, Exs. 2 (Texas Concrete's 2017 policy), 7 (Apcon's 2017 policy).

I. **The Insureds were named as defendants in three lawsuits alleging that numerous entities contributed to flooding by releasing substances into the waterways.**

In 2018, the Insureds were named as defendants in the first of three mass tort lawsuits arising out of Hurricane Harvey property damage. In the first of those suits (the "*Ellisor*" suit), 482 plaintiffs sued the Insureds and 51 other defendants to recover flood damages to their property. *See generally id.*, Ex. 8. The *Ellisor* suit alleges that defendants contributed to the decades-long degradation of the waterways and retention lakes that were built to control flooding in the Houston area. *Id.* Since 1954, the defendants allegedly have released "materials and substances" into these bodies, causing their capacity to decrease significantly over time. *Id.* ¶¶ 565-68. As a result, the flood controls and lakes "simply could not hold the volume" of water that fell during Hurricane Harvey, causing them to overflow. *Id.* ¶¶ 572-89.

2

In 2020, two other suits were filed against the Insureds: the "*Del Pino*" and "*Nelson*" suits.  *Id.*, Exs. 9, 10.  These suits included substantially the same allegations, but added 524 and 246 plaintiffs, respectively.  *Id.*  In the *Ellisor*, *Del Pino,* and *Nelson* suits (collectively, the "Underlying Lawsuits"), the plaintiffs allege multiple theories of liability against Texas Concrete, Apcon, and their co-defendants—negligence, negligence per se, violations of the Texas Water Code, and nuisance.  Dkt. 51, Ex. 8 at ¶¶ 573-89; Ex. 9 at ¶¶ 617-33; Ex. 10 at ¶¶ 338-54.  While the *Ellisor* suit has been amended repeatedly and *Nelson* has been amended once, the factual and legal theories have remained consistent and parallel—sufficiently so such that they were consolidated into Cause No. 2020-48333, *In re Harvey Sand Litigation*, an MDL in the 281st Judicial District Court of Harris County, Texas.  Dkt. 51 at 4.

## II.    Evanston filed this suit, asserting that a "Total Pollution Exclusion" forecloses any duty to defend or indemnify the Insureds in the Underlying Lawsuits.

Although Evanston has defended the Insureds subject to a reservation of rights, Dkt. 51 at 9-10, Evanston brought this suit seeking a declaratory judgment that it need not defend nor indemnify them against any claim in the Underlying Lawsuits.  Dkt. 1, 3 (First Amended Complaint).  Evanston alleged six counts, seeking declarations of no-coverage based on different policy provisions.  Dkt. 3 ¶¶ 48-89.  Ultimately, Evanston moved for summary

judgment on only one theory, arguing that the Total Pollution Exclusion in Texas Concrete and Apcon's policies barred coverage.[1]  Dkt. 51; *see also* Dkt. 3 ¶¶ 70-76 (allegations supporting Count Three – Total Pollution Exclusion).

Each policy includes the following Total Pollution Exclusion:

This insurance does not apply to:

f. Pollution

(1) 'Bodily injury' or 'property damage' which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time.

…

**SECTION V – Definitions**

… 15. 'Pollutants' mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

*Id.*, Ex. 1 at TXC000033, 42; Ex. 2 at TXC000090, 98; Ex. 3 at TXC000153, 160; Ex. 4 at APC000133, 145; Ex. 5 at APC000242, 261; Ex. 6 at APC000325, 335; Ex. 7 at 000464, 475.

The parties do not dispute that the Insureds were covered by at least one

---

[1] Evanston filed a previous motion for summary judgment on this same issue.  Dkt. 33.  But because the underlying lawsuits were undergoing multiple amendments, Evanston withdrew its motion for summary judgment and moved to stay this lawsuit until the underlying suits could no longer be amended.  *See* Dkt. 43; Dkt. 51 at 11. The motion to stay was granted.  Dkt. 44.  The stay expired on December 1, 2021, and Evanston filed the current motion for summary judgment, Dkt. 51, even though no amendment deadline has been imposed in the Underlying Lawsuits.

of Evanston's CGL policies during Hurricane Harvey, nor do they dispute that the Total Pollution Exclusions would preclude coverage if triggered by the Underlying Lawsuits.  Rather, the parties dispute the application of the exclusion's language to the factual allegations in the Underlying Lawsuits.

## **Legal Standard**

A court must grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material if the issue that it tends to resolve "could affect the outcome of the action."  *Dyer v. Houston*, 964 F.3d 374, 379-80 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)).  When resolving a motion for summary judgment, the court must view the facts and any reasonable inferences "in the light most favorable to the nonmoving party."  *See Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (internal quotation marks omitted).

<u>Analysis</u>

**I.** **Under Texas law, the "eight corners" rule governs whether Evanston must defend the Insureds in the Underlying Lawsuits.**

Texas law applies to this declaratory-judgment action based on diversity jurisdiction.[2] *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.*, 99 F.3d 695, 700 (5th Cir. 1996).   Under Texas law, an insurance company's duty to defend and duty to indemnify are distinct.   *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821-22 (Tex. 1997).   The "duty to defend is broader than its duty to indemnify."   *St. Paul Fire & Marine Ins. Co. v. Green Tree Fin. Corp.-Texas*, 249 F.3d 389, 391 (5th Cir. 2001) (citing *St. Paul Ins. Co. v. Texas Dep't of Transp.,* 999 S.W.2d 881, 884 (Tex. App.— Austin 1999, writ denied)).   Courts may determine and enforce an insurer's duty to defend "even when an insurer's duty to indemnify is not yet settled." *Id.* at 391; *D.R. Horton-Tex., Ltd. v. Market Int'l Ins. Co.*, 300 S.W.3d 740, 743-44 (Tex. 2009) (insurance company may owe one duty but not the other).

"The general rule is that the insurer is obligated to defend [its insured] if there is, potentially, a case under the complaint within the coverage of the policy." *Harken Expl. Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001) (modification in original, internal quotations omitted); *Zurich Am.*

---

[2] The parties also agree that Texas law applies.

6

*Ins. Co. v. Nokio, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008).  "Texas courts apply the 'eight corners' rule to determine whether an insurer has a duty to defend." *Green Tree Fin.*, 249 F.3d at 391 (citing *Potomac Ins. Co. of Ill. v. Jayhawk Med. Acceptance Corp.*, 198 F.3d 548, 551 (5th Cir. 2000)).  Under the "eight corners" rule, courts determine whether the conduct described in the factual allegations, if taken as true, state a cause of action within the terms of the policy.  *Id.*  "The focus of this inquiry is on the facts alleged, not on the actual legal theories."  *Id.* at 392 (internal citation omitted).

"The factual allegations in a third party's complaint must be liberally construed in favor of the insured."  *Id.*  If there is a "doubt as to whether or not the [factual] allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in [the] insured's favor."  *Harken*, 261 F.3d at 471 (modifications in original, internal quotations omitted); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merch. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997) ("When applying the eight corners rule, we give the allegations in the petition a liberal interpretation.").

## II.   **Evanston has not established that the Total Pollution Exclusion bars coverage.**

Evanston has moved for summary judgment on the grounds that the Underlying Lawsuits allege claims that "fall squarely within" the policies'

Total Pollution Exclusion.  Dkt. 51 at 12-21.  As the insurer, Evanston bears the burden of proving that the exclusion "constitutes an avoidance of or an affirmative defense to coverage."  *Canutillo Indep. Sch. Dist.*, 99 F.3d at 701.

Under the "eight corners" rule, Evanston must show that that the factual allegations in the Underlying Lawsuits trigger the Total Pollution Exclusion. *See Green Tree Fin.*, 249 F.3d at 391.  That is, for Evanston to prevail on summary judgment, the underlying plaintiffs must have alleged "'bodily injury' or 'property damage' which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."[3] *See* Dkt. 51, Ex. 1 at TXC000033.

### A. Because the Underlying Lawsuits allege property damage and release, the dispositive issue is whether they alleged "pollutants."

The parties do not dispute that the underlying plaintiffs have alleged property damage arising out of Hurricane Harvey flooding, caused by defendants' displacement of floodway capacity.  The Insureds dispute the next component of the Total Pollution Exclusion—that the underlying plaintiffs alleged "actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape"—because plaintiffs allege only unintentional,

---

[3] Because the Total Pollution Exclusion is identical in each policy, further citations to its language will reference only one of the policies.

negligent conduct.  Dkt. 62 at 10-13.  But the plain language of the Total Pollution Exclusion does not distinguish between intentional or unintentional releases of material.  *See* Dkt. 51, Ex. 1 at TXC000033.  The Underlying Lawsuits assert that defendants' materials ran off their privately controlled property and "entered" the public Houston waterways, Dkt. 51, Ex. 8 at ¶ 572, Ex. 9 ¶ 616, Ex. 10 ¶ 337, and the insureds have identified no authority permitting them to embed a scienter requirement that would take these factual allegations outside the meaning of "discharge, dispersal, seepage, migration, release or escape."  *See* Dkt. 62 at 10-13.

Accordingly, the Court agrees with Evanston that the dispositive "question is whether materials and substances such as processed water, silt, sand, sediment, dirt, rock, aggregate and the like constitute 'pollutants.'"  Dkt. 51 at 14.  To answer this question, Evanston asks the Court to focus myopically on the substances allegedly discharged and deem them *per se* polluting regardless of the factual context.  *See generally id.* at 12-17.  That approach does not comport with case law or the parties' agreed-upon definitions.

### B.    Aggregates and particulates are not *per se* pollutants.

Evanston argues that the *Del Pino* suit illustrate that the Total Pollution

Exclusion applies to all three Underlying Suits.[4]  The *Del Pino* petition alleges

that the defendants, including the Insureds, discharged "processed water, silt,

sand, sediment, dirt, and other materials" into Houston-area waterways and

lowered their capacity—effectively displacing potential floodwater with

discharge.  Dkt. 51 at 13 (quoting *Del Pino* petition, *id.*, Ex. 9 ¶ 7).  These

specific materials are not expressly included in the policies' definition of

"pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant,

including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  *See*

*id.*, Ex. 1 at TXC000042.  Nonetheless, Evanston invokes cases where courts

classified these materials as pollutants under substantially similar pollution-

exclusion clauses.  But the cases do not classify these materials as "pollutants"

---

[4] Evanston accurately notes that the *Ellisor* and *Nelson* lawsuits no longer identify
the types of substances that the defendants allegedly allowed to lower the waterway's
capacity.  Dkt. 51 at 5.  Instead of identifying processed water, silt, sand, sediment,
dirt, rocks, dusts, or the like, the *Ellisor* and *Nelson* plaintiffs have amended their
petitions to complain of unspecified "materials and substances" entering the
waterways.  *Id.* (citing Ex. 8 ¶ 569, Ex. 10 ¶ 334).  While Evanston's observation is
correct, the distinction is immaterial to the Court's analysis.

The Court need not and should not look beyond the "eight corners" to consider
previous versions of the *Ellisor* or *Nelson* complaint.  *See* Dkt. 51 at 18-22.  Doing so
would be both improper and unnecessary, as the Court's analysis is limited to the
"latest, and only the latest, amended pleadings."  *See Bitco Gen. Ins. Corp. v. Monroe
Guar. Ins. Co.*, 31 F.4th 325, 329-30 (5th Cir. 2022) (quoting *Rhodes v. Chicago Ins.
Co.*, 719 F.2d 116, 119 (5th Cir. 1983) (applying Texas law)).

in *every* coverage dispute.

In *Clarendon American Ins. Co. v. Bay, Inc.*, 10 F. Supp. 2d 736, 744 (S.D. Tex. 1998), an insurer owed no duty to defend a cement company for certain claims because silica was found to be "within the ambit of 'pollution' as defined in [the exclusion]." The underlying lawsuits alleged bodily injuries from inhaling "dust, sand, and other substances containing silica" while working at the insured's cement facility. *Id.* at 743. The court "pars[ed] the language" of the policy's Total Pollution Exclusion and found that, when applied to the underlying factual allegations, the policy required a "mixed coverage result." *Id.* Coverage was excluded for bodily injuries allegedly resulting from plaintiffs' contact with "*any* solid, liquid, [or] gaseous … *irritant or contaminant*"—*e.g.*, silica in the air. *Id.* at 743, 745 (emphasis in original). But the insurer was required to defend the insured for bodily injuries arising out of contact with materials that were in their "intended container or location." *Id.* at 744. Thus, the context in which the materials injured the plaintiffs determined whether it was "pollution."

In *Cleere Drilling Co. v. Dominion Exploration & Production, Inc.*, 351 F.3d 642, 651-52 (5th Cir. 2003), the Fifth Circuit analyzed whether materials released from an oil rig blowout fell within a drilling contract's "Pollution and Contamination" clause. Because the contract did not define

"contamination"—which likewise is true in this suit—the court looked to dictionary definitions. *Id.* at 651. One source defined contamination as a "[c]ondition of *impurity* resulting from mixture or contact with foreign substance," which the court noted did not require environmental harm. *Id.* at 651 & n.17 (quoting Black's Law Dictionary 1159 (6th ed. 1990) (emphasis added)). Another source defined the verb, "to contaminate," as "to *soil, stain, corrupt, or infect* by contact or association" or "*to render unfit* for use by the introduction of unwholesome or undesirable elements." *Id.* at 651 & n.18 (Webster's Third New International Dictionary 491 (1986) (emphasis added)).

The Fifth Circuit applied Webster's definition for "contamination" when holding that the "salt water, sand, and drilling mud" from the blowout were "foreign substances" or "undesirable elements" that "rendered the surface area soiled, stained, impure, and almost certainly *unfit for its intended use*." *Id.* at 651 (emphasis added). Once again, the mere involvement of "sand" and "mud" was insufficient in itself to constitute "pollution." The court reasoned that the defendant need not have caused environmental harm to have contaminated the area, but its decision to "spen[d] hundreds of thousands of dollars on the expedited removal of those substances" demonstrated that the land had been soiled and rendered unfit for use. *Id.* at 651-52.

Finally, in *Eastern Concrete Materials, Inc. v. Ace American Insurance Co.*, 948 F.3d 289, 301-02 (5th Cir. 2020), the Fifth Circuit applied the same dictionary definitions from *Cleere Drilling* to find that a quarry's rock fines had contaminated a creek.  The rock fines were released when a manager failed to shut down a pump, causing a substantial discharge that changed the flow and contours of the creek.  *Id.* at 294-95.  The Fifth Circuit acknowledged that the rock fines did not "mix" with the creek to make it "impure"—the definition in Black's Law Dictionary—but they were still "contaminants" under Webster's definition because they "*rendered* the creek *unfit for use* as a habitat for trout and other species."  *Id.* at 302 (emphasis added).

In sum, these authorities have parallels to this lawsuit, but they do not stand for the proposition that aggregates and solid particulates constitute "pollutants" *per se*.  Such a proposition would allow the tail to wag the dog. The Court cannot look to prior applications of pollution-exclusion clauses and then search the Underlying Lawsuits for mentions of the same materials. Rather, the Court must look to the specific factual allegations in the Underlying Lawsuits and then apply policy language and plain meanings to those allegations.  *Green Tree Fin.*, 249 F.3d at 391-92.

### C.   The Underlying Lawsuits do not allege that the Insureds discharged "contaminants" or "waste" into the waterways.

Applying the "eight corners" rule, the Court concludes that the

Underlying Lawsuits do not allege that Texas Concrete or Apcon released "pollutants" into Houston's flood control waterways.  Again, the policies define "pollutants" as "any solid, liquid, gaseous or thermal *irritant or contaminant*, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and *waste*." Dkt. 51, Ex. 1 at TXC000042; Ex. 2 at TXC000098; Ex. 3 at TXC000160; Ex. 4 at APC000145; Ex. 5 at APC000261; Ex. 6 at APC000335; Ex. 7 at 000475 (emphasis added).  Because Evanston does not contend that the Underlying Lawsuits implicate "irritants," Dkt. 64 at 8 n.11, summary judgment is appropriate only if the substances in question qualify as "pollutants" because they are "contaminants" or "waste."  Dkt. 64 at 8.  A careful review of the underlying factual allegations demonstrates that they are neither.

1.   <u>The lawsuits do not allege that the aggregates were "contaminants."</u>

The factual allegations in the Underlying Lawsuits are substantially identical, except that the *Del Pino* petition describes the types of materials released into Houston-area waterways as "processed water, silt, sand, sediment, dirt, and other materials," while the *Ellisor* and *Nelson* petitions allege the release of generic "materials and substances."  *Compare* Dkt. 51, Ex. 9 ¶ 7 (*Del Pino* petition) *with id.*, Ex. 8 ¶ 8 (*Ellisor* petition) *and id.*, Ex. 10 ¶ 8 (*Nelson* petition).  This distinction does not change the outcome because none of the Underlying Lawsuits accuse the Insureds of releasing "contaminants"

14

under any of the definitions that Evanston invokes.[5]

        a.    *There is no allegation that any discharge soiled, stained, corrupted, or infected the waterways or made them "impure" by mixture.*

The nature of the underlying allegations readily forecloses Evanston's reliance on certain alternative definitions of "contaminant." As mentioned above, one meaning of "contamination" is a "[c]ondition of impurity resulting from mixture or contact with foreign substance." *Cleere Drilling*, 351 F.3d at 651 (quoting Black's Law Dictionary). A related definition provides that "contaminate" means "to soil, stain, corrupt, or infect by contact or association ...: make inferior or impure by mixture ...." *McConnell Constr. Co. v. Ins. Co. of St. Louis*, 428 S.W.2d 659, 661 (Tex. 1968) (quoting this definition from Webster's Third New International Dictionary).

For these definitions to foreclose a duty to defend, the Underlying Lawsuits would need to complain that the Insureds released substances that rendered the waterways and lakes impure, either by mixing with the existing water or soiling or staining it upon contact. That is not what the Underlying

---

[5] The parties disagree on whether the Underlying Lawsuits allege facts that satisfy the definitions of "contamination," but they agree at least on the definitions themselves. Given this agreement, the Court need not address whether the policy is ambiguous before analyzing the Underlying Lawsuits within the ambit of the "eight corners" rule. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (insurance policies, like contracts, are ambiguous only if the express language cannot be given "definite or certain legal meaning").

Lawsuits allege. Instead, they allege the mere *presence* of the released substances reduced the *capacity* of the waterways, thereby exacerbating the flooding during Hurricane Harvey. *See* Dkt. 51, Ex 8 ¶¶ 565-68, Ex. 9 ¶¶ 609-12, Ex. 10 ¶¶ 330-33.

Rather than assert that the released substances combined with water in the waterways, the Underlying Lawsuits invoke a different physical phenomenon whereby the substances displaced the water. As such, the allegations do not implicate Evanston's first two definitions of "contaminant." *Cf. McConnell*, 428 S.W.2d at 661 (corrosion constituted physical "destruction and … disintegration" or a "degenerative reaction," but not "contamination" vis-à-vis a mixture resulting in impurity that would trigger a policy exclusion).

    b. *The allegations do not assert that the Insureds' releases rendered the waterways unfit for use.*

The alternative definition of "contaminant" requires a more nuanced analysis. Under that definition, "to contaminate" means "to render unfit for use by the introduction of unwholesome or undesirable elements." *Cleere Drilling*, 351 F.3d at 651 (quoting Webster's Third New International Dictionary); *see also McConnell*, 428 S.W.2d at 661 (same definition).

Although the substances at issue may be characterized as "unwholesome or undesirable" when added to the waterways, the critical question is whether the Insureds' alleged introduction of those substances rendered the waterways

16

"unfit for use." *See Cleere Drilling*, 351 F.3d at 651.  That definition necessarily requires the Court to consider the magnitude of the Insureds' alleged conduct. After all, releasing a nominal quantity of substances could not have made the waterways unfit for their flood-control purposes.[6]

Here, however, the Underlying Lawsuits attribute the reduced capacity of the waterways to the *collective* actions of more than 50 defendants.  The Insureds comprise only two out of 53 defendants in *Ellisor*, 56 in *Del Pino*, and 55 in *Nelson*.  *See* Dkt. 51, Ex 8 ¶¶ 502-54, Ex. 9 ¶¶ 543-98, Ex. 10 ¶¶ 265-319 (naming defendants as parties).  There is no claim that the Insureds individually "render[ed]" the waterways "unfit for use."  Thus, construing those factual allegations liberally, the Insureds—as individual parties—were not alleged to have released enough materials to displace the water and cause plaintiffs' property flooding.  *See Harken*, 261 F.3d at 471; *Merch. Fast Motor Lines*, 939 S.W.2d at 141.

---

[6] This result, which conditions "contamination" on magnitude and causation to unfitness, comports with the "common sense" limiting principle that insureds should not be denied coverage whenever they release only a slight amount of "foreign" or "unwanted" material.  *Cleere Drilling*, 351 F.3d at 652-53 (analyzing *Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co.*, 112 F.3d 184, 188 (5th Cir. 1997) and *Pipefitters Welfare Educ. Fund v. Westchester Fire*, 976 F.2d 1037 (7th Cir. 1992), to note that hypothetically absurd outcomes would result if pollution-exclusion language is not applied with some limitation).

Only once does each Underlying Lawsuit even mention the Insureds by name—in the "Parties" section of the petitions.  Dkt. 51, Ex. 8 ¶¶ 515, 520, Ex. 9 ¶¶ 556, 562, Ex. 10 ¶¶ 278, 284.   Their operations and locations are not described, and they are never specifically identified in any factual allegation. *Id.*  Moreover, the factual background attributes actions either to other entities or to a vague subset of defendants (which may or not include the Insureds):

- "Many defendants to this lawsuit own and/or operate mining facilities" near the flood control waterways.  Dkt. 51, Ex 8 ¶ 569, Ex. 9 ¶ 613, Ex. 10 ¶ 334.

- "Many defendants have been cited by Texas Commission on Environmental Quality (TCEQ) for numerous issues, including ['allowing materials and substances' or 'excessive discharge which contained runoff dust, sand, construction materials, and other products produced and/or used by Defendants'] at locations and/or facilities and/or properties adjacent to" the waterways.  Dkt. 51, Ex 8 ¶ 569, Ex. 9 ¶ 613, Ex. 10 ¶ 334 (specifically identifying the LGI co-defendants).

- "Some defendants were cited because they were operating above their allowed permit limits.   Other defendants were operating without any permits at all."  Dkt. 51, Ex 8 ¶ 570, Ex. 9 ¶ 614, Ex. 10 ¶ 335.

- "The defendants that own and/or operate mining facilities, construction sites, batch plants commercial properties and/or other facilities" have reduced vegetation and reused to erect barriers to stop spill over into the waterways.  Dkt. 51, Ex 8 ¶ 571, Ex. 9 ¶ 615, Ex. 10 ¶ 336.

Evanston has not demonstrated which, if any, of these allegations can be attributed to Texas Concrete or Apcon such that the Underlying Lawsuits have stated a claim for pollution *specifically* against them.  And the Court cannot assume that any allegation includes the Insureds when the underlying

plaintiffs did not attribute all allegations to *all* defendants. *Compare Sphere Drake Ins. PLC v. Gainsco Cnty. Mut. Ins. Co.*, 273 F.3d 1100 (5th Cir. 2001) (per curiam) (construing the underlying plaintiffs' use of "defendants" generally as "convenient shorthand in lieu of redundantly re-alleging the same facts against each [of hundreds of] defendant[s] by name"), *with Admiral Ins. Co. v. Petron Energy, Inc.*, 1 F. Supp. 3d 501, 507 (N.D. Tex. 2014) (relying on *Sphere Drake* to construe the underlying allegations against one "and/or" another defendant to be vague and not specifically targeted at the insured, and concluding the insurer had "not borne its burden of demonstrating that [the pollution] exclusion ... preclude[s] a duty to defend").

Liberal construction is especially warranted because the underlying plaintiffs were intentional about their pleadings. They theorize that harm to Houston's flood controls occurred gradually, with no defendant bearing sole responsibility:

- Since 1954, Lake Houston's water capacity has "sustained a steady decline," measured at 21.4% in 2011. Dkt. 51, Ex 8 ¶¶ 565-67, Ex. 9 ¶¶ 609-11, Ex. 10 ¶¶ 330-32.

- Other surveys "over the past few decades" show similar capacity decreases in the waterways surrounding Houston, including the San Jacinto River. *See* Dkt. 51, Ex 8 ¶ 568, Ex. 9 ¶ 612, Ex. 10 ¶ 333.

- The release of materials that decreased capacity occurred through a "series of actions [that] has occurred over time." *See* Dkt. 51, Ex 8 ¶ 9, Ex. 9 ¶ 8, Ex. 10 ¶ 9.

- Only defendants' actions, "[a]ltogether" caused the waterways to "lose capacity." Dkt. 51, Ex 8 ¶ 572, Ex. 9 ¶ 616, Ex. 10 ¶ 337.

As a final matter, the type of materials released and the Insureds' role "at least in part" in displacing water capacity are not sufficient to trigger the Total Pollution Exclusion. Dkt. 64 at 11. That is because the Court need not address whether the Insureds' release of "pollutants" caused property damage "in whole or in part" *until* Evanston has proven the release of "pollutants" at all.[7] *See* Dkt. 51, Ex. 1 at TXC000033 (Total Pollution Exclusion). And to qualify as "pollutants" under the relevant definition of "contaminate," the actions of the Insureds must have caused the waterways' unfitness. Yet the Underlying Suits assert it was only *all* defendants' collective conduct that caused water displacement through a "series of actions [that] has occurred" from 1954 to 2017. Dkt. 51, Ex 8 ¶¶ 9, 572, Ex. 9 ¶¶ 8, 616, Ex. 10 ¶¶ 9, 337.

In sum, under the "eight corners" rule, the underlying allegations fail to satisfy any of the agreed-upon and recognized definitions of "contamination." This definition of "pollutants" does not foreclose Evanston's duty to defend.

---

[7] Evanston points out that the Underlying Lawsuits seek joint and several liability against all defendants, including the Insureds. Dkt. 64 at 2-3 (citing Dkt. 51, Ex. 8 ¶¶ 10, 580, 589, 603, Ex. 9 ¶¶ 9, 624, 633, 647, Ex. 10 ¶¶ 10, 345, 354, 368). Whereas this attribution of damages is a legal theory, the Court's analysis is limited to *factual* allegations. *Green Tree Fin.*, 249 F.3d at 391 ("The focus of this [eight corners] inquiry is on the facts alleged, not on the actual legal theories.").

2. <u>The aggregates allegedly released were not "waste."</u>

Evanston also argues that the materials and substances allegedly responsible for the property damages are "waste" under the Total Pollution Exclusion because they are "unwanted by-product[s] of a manufacturing process" and/or "superfluous material produced by a manufacturing process." Dkt. 64 at 9. To support its theory, Evanston cites allegations in *Del Pino* that "[m]any defendants have been cited by the Texas Commission on Environmental Quality for numerous issues, including excessive discharge which contained runoff dust, sand, construction materials, and other products." *Id.* (citing Dkt 51, Ex. 9 ¶ 613). The Court is not persuaded.

First, only a few *co-defendants* are specifically identified as subjects of TCEQ investigations. The Court must therefore assume that the Insureds were not among the "many defendants" referenced. *Harken*, 261 F.3d at 471; *Merch. Fast Motor Lines*, 939 S.W.2d at 141; *see also supra*, Section II(C)(1).

Second, the policy language cited by Evanston implies that the Insureds' discharge was not waste. Evanston's motion defines Texas Concrete's business as "excavating sand/gravel" and Apcon's business as "commercial construction." Dkt. 51 at ¶ 4 (citing Dkt. 51, Exs. 1, 6); Dkt. 64 at 9-10. Based on the nature of these businesses, Evanston argues that the Insureds seek coverage for damages arising out of their waste. Dkt. 64 ¶¶ 12-13 (citing Dkt.

51, Exs. 8-10).   But there is nothing about "excavating sand/gravel" or "commercial construction" that inherently indicates the generation of waste. Moreover, the factual allegations do not characterize aggregate materials or construction materials as "unwanted" or "superfluous."   *See Mid-Continent Cas. Co. v. Safe Tire Disposal Corp.*, 16 S.W.3d 418, 423 (Tex. App.—Waco 2000, pet. denied) (defining "waste" to include "an unwanted by-product of a manufacturing process"); *Waste*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/waste (last visited Aug. 2, 2022) (defining "waste" as "damaged, defective or superfluous material produced by a manufacturing process"); *Waste*, American Heritage Online Dictionary, https://ahdictionary.com/word/search.html?q=waste (last visited Aug. 2, 2022) (defining waste to include "an unusable or unwanted substance or material"). *See also generally* Dkt. 51, Exs. 8-10; *supra*, Section II(C)(1).   If anything, Evanston insured Texas Concrete and Apcon to operate in these industries, and the released materials are the very products that are essential to the Insureds' daily business operations and services.   Dkt. 51, Exs. 1, 6.   They therefore do not constitute "waste" under the Total Pollution Exclusion.

Based on the foregoing, the Evanston has not shown that coverage is foreclosed.   It therefore owes Texas Concrete and Apcon a duty to defend them in the Underlying Lawsuits.

### III.   Resolving Evanston's duty to indemnify is premature.

Whereas the duty to defend hinges on factual *allegations*, the "facts *actually established* in the underlying suit control the duty to indemnify." *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 656 (Tex. 2009) (emphasis added) (quoting *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006)).   Ultimately, the duty to indemnify depends on "whether a plaintiff ultimately prevails on a claim covered by the policy." *Penn-Am. Ins. Co. v. Tarango Trucking, L.L.C.*, 30 F.4th 440, 448 & n.25 (5th Cir. 2022) (quoting *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 31 n.41 (Tex. 2008)).

Because Evanston owes the Insureds a duty to defend, it would be "premature for the district court to decide the indemnity issue."   *Id.*   The recommended course is to deny Evanston's summary-judgment motion, both with respect to the duty to defend and duty to indemnify Texas Concrete and Apcon in the Underlying Lawsuits.

### Recommendation

It is therefore **RECOMMENDED** that the Court **DENY** Plaintiffs Evanston Insurance Company and Essex Insurance Company's Motion for Summary Judgment (Dkt. 51).

**The parties have fourteen days from service of this Report and**

Recommendation to file written objections.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.  *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).

Signed on August 2, 2022, at Houston, Texas.

Yvonne Y. Ho
United States Magistrate Judge